Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and it's out of the court. Good morning and welcome to the last day of our oral argument sitting. Judge Anderson, Judge Choflat and I are very happy that you are with us. Our telephone arguments have worked pretty well over the week, so hopefully they'll do so today again. Valerie will give you a two minute warning when you're about to run out of time so that you'll know and can then begin up wrapping up your discussion. With that, we're ready to go and we will start with our first case, Dana Anderson et al versus the Surgery Center of Cullman. It's two cases, number 17-14783 and number 18-14082. Mr. Guerriere. Good morning and may it please the court. My name is Charles Guerriere. I am the attorney for the in these two combined appeals. These appeals involve sort of three broad issues. One relates to Ms. Anderson and the court's decision to grant directive verdict as to her outreach claim and summary judgment as to her constructive discharge claim. Ms. Lackey's Title VII and tort claims, all of which were dismissed on summary judgment and then the district court's on attorney's fees. Unless the panel has some other preference, I'll proceed in that order. Starting with Ms. Anderson, I believe one of the issues can be disposed of rather quickly and that relates to Ms. Anderson's constructive discharge claim against the Surgery Center of Cullman or as it's called SCA. Ms. Anderson was a nurse working at the Surgery Center and as I think the district court found, she and the other nurses were subjected to a sexually hostile environment while they worked there at the hands of Dr. Johnson. At one point, Dr. Johnson took a leave of absence from the Surgery Center. The question is whether Ms. Anderson, who quit, was constructively discharged. In concluding that her constructive discharge claim had no merit, the district court erroneously concluded that she had resigned in March of 2011 rather than March in 2012. Dr. Johnson left in 2011. The district court erroneously concluded that she had resigned before waiting to see if the corrective measures were effective. Of course, that's not correct. She remained for another year during which time there's evidence that SCA, knowing of the hostility between Dr. Johnson and Ms. Anderson, required Ms. Anderson to work with Dr. Johnson at night closing the facility alone, that there's evidence that in October of 2011, SCA sponsored a Halloween party where the desserts were decorated with sexually offensive... Judge Anderson with a question. With respect to that comment, when Plaintiff Anderson was complaining about having to close up with that, Dr. Johnson was listening in and said something to the effect that if you put enough on her, she'll leave. Did anybody in management hear that? I can check the transcript on that, Your Honor, but I believe there's some question as to whether either Ms. Bates, the administrator, or Ms. Crooks, and I may have them backwards, heard that, but I don't think the constructive discharge claim will turn on whether or not anyone heard that. Having been subjected to a hostile environment and two investigations, and then to find out that SCA itself sponsored this Halloween party where they provided the cakes with decorated with, as I said, Dr. Windham's botched... that no reasonable person should be expected to remain in that environment, because it's very clear that the hostile environment hasn't stopped. Well, the other side argues that she testified and admitted that she suffered no harassment on the part from Dr. Johnson after she complained. Right. There was no sexual harassment from Dr. Johnson, but the question is she wasn't resigning from Dr. Johnson. She was resigning from SCA, and it's SCA who had the obligation to stop the harassment. It is the conduct of SCA that led to her constructive discharge, and that was them intentionally assigning her to work with Dr. Johnson alone late at night, and them sponsoring a staff event that was sexually offensive that led her to conclude that she just couldn't stay around there because they were not going to protect her. And that'll be a question, obviously, there's... it'll be... since this is a summary judgment, that would be a question of fact. The jury would have to decide, but at this point, we just believe summary judgment's inappropriate because the only grounds for granting it was an erroneous conclusion that she left without giving them an opportunity. What do you make... this is Judge Jordan, Mr. Gurrier. What do you make of the district court's partial reliance on the attempts of some of the administrators at Coleman to not have Ms. Anderson resign? It's our contention that that has confused the status of constructive discharge law. There was a time when the courts suggested that you needed to show that the constructive discharge was intended by the employer. That's not the law. So whether they didn't want her to resign or not doesn't affect, as a matter of law, the constructive discharge. What we do believe it shows is they understood the power that they had because they provided the nurses to this facility. And if they wanted the conduct to stop, they could have stopped Dr. Johnson very earlier. They could have made the environment safe by merely saying, our nurses are not going to serve these doctors unless you clean up your act. They're separate. They're a separate entity, SCA providing the nurses to the doctors. If the doctors weren't going to clean up their act, I think SCA has an obligation not to encourage the women to stay there and see what happens, but to stand up for the women and say, you're right. We're going to make certain this environment is safe. In that context, of course, they also, through their silence, misled the women into believing that Dr. Johnson would be leaving. And that wasn't correct. He came back. I am, Judge Anderson, I am concerned, though, that the sexual harassment did, in fact, stop. Right. But the constructive discharge doesn't require that there be a continuation of the sexual harassment. It can be that the environment continued to be fearful that they failed to take corrective actions and indeed the mistreatment of her. Remember, this is a hostile environment case, not so much a sexual harassment case. So Dr. Johnson wasn't sexually propositioning the women. He was exercising an antipathy to having women in the workplace unless they did his wishes. So his conduct was abusive, threatening, and the environment in which Ms. Anderson found herself was threatening and abusive. Judge Choflat, I interpret your argument to be that she resigned out of fear and not as a result of any physical molestation, for example. Yes, out of justifiable fear. Yes, just pure fear. That's what your argument is. I'm not saying I agree with it, but that's what it is. Is it not? Yeah, justifiable fear and the recognition that with that cake event that the same atmosphere of sexual innuendo in the workplace... Whatever the atmosphere was, but it was mainly fear, was it not? Yes. She would be there at the end of the day with him and they'd have to close out. Yes. And he had previously made threats against her, as that's in the record, as the things that had led to the original hostile environment. I'd like to then, as my time goes here, I'd like to go on to the Anderson outrage claim. The jury found in favor of Ms. Anderson on her outrage claim against Dr. Johnson. And the district court in considering the defendant's motion for a directed verdict following the verdict concluded that Ms. Anderson had not presented sufficient evidence to demonstrate that she suffered severe or extreme emotional distress and said there was no outward signifier or manifestation of her distress. Ms. Anderson contends that that's an improper legal standard that the court has improperly taken the word extreme, which is to describe the conduct that will create the tort of outrage or intentional infliction and applied it to the level of distress. The distress required by the Alabama Supreme Court is distress must be so severe that no reasonable person could be inspected to endure it. And endure means simply you shouldn't, that you could suffer it patiently without complaining. The reading that the court gave to this element is that it somehow has to be, your emotional distress has to be so severe that you're about to commit suicide or you're sent to a mental institution. And that's not the standard. The Supreme Court of Alabama in Green Tree, we cite in our brief 1990 case, said that the emotional distress must be of a degree more severe than a reasonable person could be expected to endure. That was the jury instruction given to the jury. We believe that the jury followed the jury instruction, that there is certainly sufficient facts in the record to support the jury's verdict on emotional distress damages, and that the district court's decision granting the director verdict should be reversed. Again, it's John, with a question. While no case that I'm aware of has said that some kind of out would signify something like sleeplessness or loss of weight or contacting therapists, etc., no case has said that's required. But on the other hand, there's never been a case, has there, in which something like that was not present? Well, I think in many of the cemetery cases, it's not really very clear. In fact, in some instances, the Supreme Court of Alabama seems to imply that the outrageous conduct would ordinarily and necessarily create severe emotional distress with humiliation and embarrassment. And so there's no evidence of any outside signifiers in those cases. And this was Judge Joflot, is that correct? No, Judge Anderson. Okay. Because I was going to point out, I think there's a very early 11th Circuit case, one of the very first to interpret the Alabama tort of outrage, it's Holmes v. Oxford Chemicals, 672 Fed 2nd, 854, a 1982 case where Judge Joflot was on the panel, I believe it was Judge Tuttle, where there is basically a one-month reduction in disability benefits, where there's discussion about the individual had depression, emotional distress, and physical weakness, but there's no discussion of outward manifestations, no going to a doctor, no vomiting, none of those outward manifestations. And part of that is that that linking of physical harm to emotional distress is certainly a historic issue in tort law, but since the 1940s or 50s, this reluctance to just find emotional distress damages has been disappearing in tort law, and the requirement that you link your emotional distress to some physical manifestation is getting more and more used in the wrong standard by saying that the emotional distress can be severe and extreme. It only needs to be more than a reasonable person could be expected to endure, and we believe the evidence is fairly clear that no reasonable person, no reasonable woman in a workplace today should have to endure being called a dick wrangler and being called a whore in a slut every day and being threatened with being held under the water until the bubbles stop or being ridiculed because of your gender without complaining. That's just more severe than should be necessary. Now, I can transition there to Ms. Lackey's claims. Kathy Lackey's claims involve hostile environment and constructive discharge against surgical care, but also an outrage claim against Dr. Johnson. And since we're on that outrage claim, the district court recognized with regard to Ms. Lackey that she was subjected to outrageous conduct through the sexual harassment. So for the outrage claim at summary judgment, the only question is whether her emotional distress was sufficiently severe. And again, at summary judgment, we have to look at the facts in the light most favorable to Ms. Lackey. And there is evidence that during the six months in which she worked there, the abuse was so bad that she would cry at home thinking how abusive he was, and she had no ability to stop it. Every day when she'd arrive at work, she would get nauseous, worrying about what he would do to her that day. She feared for her personal safety because he bragged about his gun collection and talked about retaliating against those who opposed him. She was fearful that he would, since she saw the way he was treating Ms. Anderson, she was fearful that he would start treating her like Ms. Anderson. And then, of course, it's the humiliation that she was suffering after the catheterization incident where Dr. Johnson, in front of patients and staff, would talk to, would respond to a nurse by referring to her dick wrangling skills and her inability to catheterize male patients. Of course, Judge Anderson thought that the district court rejected that claim on the Farragut defense. You better address that. Yes. And that's where it's a little bit confusing. He applied the Farragut-Elleris defense and said that she didn't complain early enough. But, of course, from the facts, it's not clear that the conduct to which she was subjected rose to the level of being a hostile environment until November of 2011 when you have the dick wrangler event. Prior to that time, she's seen events and she's hearing things said to other women, and she's being mistreated. But it's not clear it meets the standard for a hostile environment yet. Also, it's clear that, I think, for summary judgment purposes, that members of the administration at SCA knew or should have what Dr. Johnson was doing. He'd been once investigated for hostile environment, and they found a hostile environment. It was continuing this next year. He was announcing over the loudspeaker about Dana Anderson and Kathy Lackey's dick wrangling skills. Ms. Lackey had gone to the administration very early when she started and said, what's up with Dr. Johnson? And they had told her, look, he is what he is, just deal with it. Counsel, two-minute warning. Thank you. So, we think, certainly for summary judgment, there's enough there to show that she did complain. And, of course, the Farragut-Elleris defense is two parts. The second is, did they take prompt and effective action to stop it? And we think the evidence is that, considering the investigations, and he was continuing to do this with Kathy Lackey, that they didn't have a system for promptly and effectively remedying discrimination. With regard to the constructive discharge claim, again, I don't want to lose my time here without going to the third issue, but we think we have adequately dealt with Ms. Lackey's constructive discharge claim in our brief. So, I would like to turn to the final issue, which is the question of attorney's fees. And we think there are two inconsistencies that require some reversal here. First, I want to start with the district court's decision is not consistent with this circuit's decision in NRA Home Depot, which was handed down last July after the brief, in this case, for N. It's at 931 Fed 3rd, 1065, a case in which Judge Joflot wrote the opinion. And while there, that involves sort of a consumer case, the circuit noted that it may no longer be proper to And that's exactly, of course, what the district court did here is they reduced the Lodestar based upon results obtained when those same factors were already included in establishing the Lodestar. Now, I see my time is up. And unless you have further questions, I will just reserve my remaining time for rebuttal. All right. Thank you so much. Ms. Weiner? Yes. May it please the court, I'm Catherine Settle Weiner. I represent surgical care affiliates. I would like to address the constructive discharge claim as that is how Ms. Anderson and Ms. Lackey's counsel began. Constructive discharge, as this court is well aware, requires a high standard to meet. The standard is that the conduct must be so intolerable that a reasonable person in the employee's position would have felt compelled to resign. As Judge Anderson correctly noted, Ms. Anderson and Ms. Lackey both testified that after the complaint in early 2011, neither were subject to sexual harassment by Dr. Johnson. That is important. Further, with regard to Ms. Lackey's constructive discharge claim, she did- The counsel for this, Judge Anderson, counsel for plaintiffs says that while there was no what do you say about that? You know, I think your honor is correct that they testified, and I think it was Judge Johnson who said that it was because of fear, they resigned because of fear. And if fear is the driving motivator, it must be subjective and objectively reasonable. Here, Ms. Lackey resigned while Dr. Johnson was on leave. He had no opportunity because he was on leave to subject her to a hostile environment during that time. Further, Ms. Anderson testified that she resigned because she thought Johnson would fire her. Yet, the district court correctly concluded that she knew that Johnson did not have authority to terminate her employment. Therefore, even if both of these women subjectively feared that Johnson would further subject her to harassment or some other mistreatment, they both knew that, one, it was impossible as to Lackey because he was not there at the time. And as regards to Ms. Anderson, she knew that what she feared could not come to pass. One of the arguments, this is Judge Jordan, one of the arguments with regard to Ms. Anderson that Mr. Guerrier makes is that your client kept assigning her to work with Dr. Johnson late at night, which was, in her view, distressing given what had happened. And there was that staff event that was, to put it in one way, sexually offensive. What do you respond to those two claims? As to assigning her to work with Dr. Johnson, that was within the scope of her duties. There had been no, again, she had complained of sexual harassment. She had not raised further complaints because no such sexual harassment happened after her January 2011 complaint. But let me ask you, can I ask you a practical question? Of course, Your Honor. And I know we don't sit as a super employer looking at the reasonableness of employment decisions, but what reasonable employer does that after these sort of complaints? One who has the reason, who believes the rehabilitation, it's prompt effective remedial measures have been successful, Your Honor. Surgical care affiliates believe that Dr. Johnson's leave of absence, seeking treatment and return had been successful. And, again, you are correct. No court should sit as a super employment department. It has to take that into account that as long as the conduct is reasonable. What did Dr. Johnson say after his leave of absence that he was going to behave? He took a leave of absence, Your Honor, and went and sought treatment and then returned to the facility. He was removed from his position as medical director. So he was not in a position at that point to provide direct medical guidance other than his role as an anesthesiologist. That's Judge Anderson with another question. You say that I'm focused on Plaintiff Anderson, not Plaintiff Lackey. You say that she didn't complain again and didn't have sexual harassment, but she did complain to Bates and Crook about the assignment that she close up with Johnson, which meant she would have to be alone. And that seems to me to be a complaint about the environment. And what I'm really concerned about is whether or not the jury could find that either Bates or Crook or anybody else in the management heard when she was complaining about having to close up with Johnson. And Johnson was listening in and said that if you give her, if you put enough on her, she'll leave. Why couldn't the jury find that somebody in management heard that? And would that not be significant? Your Honor, first off, it would be plaintiff's burden to produce such evidence that manager was doing it. Plus, Dr. Johnson had no ability to undertake those decisions as far as staffing. Those were surgical care affiliate decisions. They were not Dr. Johnson's. Dr. Johnson, as we identified in our brief, had no power to hire, fire, discipline, or evaluate surgical care employees. It would be significant though. If management heard that, that would be significant, would it not? It possibly could if they acted upon it in order to have her resign or to create an environment. Again, Ms. Anderson testified that she resigned because she thought Johnson would fire her. And the court correctly found that Dr. Johnson did not have the authority to terminate her, and she knew that he did not have an authority. So, while she may have been fearful that her employment was going to be terminated, and that, in her mind, justified her resignation, that was not objectively reasonable. That's what's required for constructive discharge, that it's a reasonable person's standard of code. It must be subjectively and objectively reasonable. One more question about Plaintiff Anderson. What evidence is there that supports, apparently, the company was investigating Plaintiff Anderson's license and accusing her of a lack of integrity? Why could she not, unless there's substantial evidence to support that kind of investigation, why couldn't Plaintiff Anderson think she was being retaliated against, in effect, continuing the hostile environment? Again, Your Honor, those were not objective. There's no evidence that those were objectively reasonable. Surgical Care had concerns about documentation regarding a log with its backup generator that provides power to the facility, whether those tests had been run as that log was incomplete, and it was Mrs. Anderson's duty to complete that log. Also, with regards to the nursing license, there was a missing documentation in Ms. Anderson's personnel file. So, they required her to complete the documentation for her personnel file. Again, this must be those—there's no evidence that any retaliatory acts were taken. There was nothing that changed the terms and conditions of her employment. Again, it's a subject of fear, and there's no evidence that any of these things would come to pass, and in fact, they did not come to pass. She resigned her employment without meeting the high standard for constructive discharge. Ms. Lackey's constructive discharge claims failed for similar reasons, as the District Court Judge Kwan concluded. Additionally, Lackey gave two weeks' notice for her resignation and worked those two weeks out. The Fifth Circuit, in 1980, ruled that giving two weeks' notice and working out a license was a stinding that the conduct was—the situation was so intolerable that the employee had no choice but to resign. So, Lackey's claim fails for that additional reason, and District Court's ruling as to constructive discharge on Anderson and Lackey is due to be in the sense that an employee who faces a very difficult environment is faced with the unhappy choice of leaving right away without giving two weeks' notice and then being subjected to an unfavorable recommendation when someone tries to check references, and then if she gives two weeks' notice and tries to work through those weeks so that there won't be any such problems, then she's told, well, you can't have a hostile work environment constructive discharge claim because you gutted it out and worked the last two weeks. Isn't that an impossible choice to be making? It is a hard decision, Your Honor, from the employee's perspective. However, the standard for constructive discharge, again, is very high. This is not one of—the standard is not that of what constitutes a harassment in the workplace. It must be so intolerable that they have felt compelled to resign. Again, that immediacy, I believe, is important to the decision. I know it is correct that an employee at a personal level may struggle with that, wanting to gut it out, as you said, but the law does—that would eliminate the high standard of constructive discharge and bring it down in line with a standard of harassment. With regard to Lackey's summary judgment on her Title VII claim regarding Farragher-Ellis, I'd like to turn to that briefly. Farragher-Ellis was met here by a surgical care affiliate we received notice of surgical care affiliate sexual harassment policy, and she later acted upon it. She chose to bring a complaint in January 2011. She did not exercise her ability to complain before then and said she elected not to. The court was correct in concluding that she exercised a plaintiff—Ms. Lackey's counsel argues that she should be excused from her choice in delaying reporting and that this court should adopt a standard of promptness for under 180 days or 130 days in EEOC deferral states and consider complaints made in that time period as prompts, and that would thwart—first off, there's no law on that, and second off, it would thwart the ability to correct things in the workplace in a prompt matter, so sexual harassment does not continue. So once the employer is made aware of sexual harassment, it can take prompt remedial measures to stop that conduct. This is Judge Anderson with a question. I understand that our Baldwin case and Walton cases have said that two-and-a-half months and three-and-a-half months—I think it was in Baldwin— are too long, but at oral argument for the first time, I learned from your opponent that dick-wrangling incident occurred in November, which was perhaps even less than two months before the January 19 complaint. What do you say about that? I say about that plaintiff's counsel, again, that is also not presented in their brief, and Lackey also had complaints regarding her tiger tail being pulled dressed up in Alabama October. What date was the dick-wrangling incident? I'd have to check, Your Honor. May I submit that citation to the court following argument? The presiding judge will tell you whether you can or not. We'll let you know. We'll try to find it in the record. That should be pretty simple to find, but if we have difficulty, we'll ask both parties for supplemental briefing. Yes, Your Honor. I want to make life easy on you. I see I'm out of time. Do you have any final questions for me? No. Thank you so much. Thank you, Your Honors. Mr. Greaves. Good morning, Your Honors. Mack Bell Greaves with the Jones Walker Law Firm in Birmingham. I like to start off with an overview of just basically stating that this case was pending for many, many years. Ms. Anderson worked at the facility for six years. She worked with Dr. Johnson that entire time. I think the record will reflect, for all fairness, in Dr. Johnson's allegations here, inappropriate behavior, so I'm not here to defend that. But does it rise to the level of severe emotional distress? Does it rise to the level of extreme and outrageous misconduct? I think it's instructive that the plaintiffs, in regard to Ms. Lackey, I'll start with that. On page 52 and 53 of their briefs, their initial brief, they go into 13 incidents that they say constituted a tort of outrage. Now, I want to point out, and I don't know if this is all that instructive or not, but I think it's important to put it in perspective. This case started out for Ms. Lackey with three allegations, and one was being called a lesbian with Ms. Anderson. The second was her tiger tail was pulled on an October of 2010 at a party, which, incidentally, I would take exception with Mr. Guerriere's description. That party was an enjoyable party. I think the record testimony will reveal that the plaintiffs, in this case, were at ease. They were having a good time. They were smiling. They posed for pictures. They were all having a good time. There are pictures of Ms. Anderson holding her tiger tail to her mouth, posing for a picture. I mean, there was a lot of horseplay involved in this. There was nobody required to be there. As a matter of fact, they made their outfits. They showed up. They wanted to have the party. So that's how that came about. There was no or harassing reason to have that party. The dick wrangler thing apparently arises out of one incident where Ms. Lackey was having trouble catheterizing a male patient, asked for help. Dr. Johnson said, exasperated, I've done this enough for you. Of course, if he said this, it's inappropriate. He said, you're going to have to handle your dicks. I can't handle those for you. And the allegation is, you can get pointers from Ms. Anderson because she knows how to handle them as well. That's the alleged incident. And that was it. Now, this Judge Anderson with the question, was that incident in Plaintiff Lackey's list? She made the list before the night for her testimony and deposition. Was that incident in her list? Yes, sir. It was, Your Honor. And so I think that's a real good point. The complaint for Ms. Lackey, and that's what I was trying to say, started out with those three incidents. Okay. Very simple. That's all. They amended the complaint three times or two times. And so over a period of 20 months, those are the only three incidents that Ms. Lackey came up with. By the time of her deposition, it had grown to seven. And by the time they got to the summary judgment stage, it had grown to 18. So it grew. It's like the fish story. It started off slow and grew and grew and grew. Now in the brief, and by the way, I think Judge England got it right. This case, he granted summary judgment on the tort of outrage claim for Anderson and for Lackey's claims in that regard with Dr. Anderson, because there was not enough evidence of severe misconduct or severe emotional stress. And then Judge Kalan came along and put the case back in for Ms. Anderson for trial. And of course, that's what we had to try the case on for her. Lackey was out of the case because they concluded that she had a sham affidavit. This was Judge England. Judge Kalan disagreed with that. And we argued the Van Junkins case and they argued the Tippins case. And Judge Kalan said, I think there's enough stuff here for Ms. Anderson, but not enough for Ms. Lackey. So now we were before the court on 13 incidents. So it was 3, 7, 18. Now we got 13. And they morphed and changed over the course of the litigation. And Judge England got it right. And I believe Judge Kalan obviously got it right. If you look at those descriptions on those pages, you'll see that it just doesn't rise to the level of hostile environment. I cited in my brief about 6 cases. You don't mean hostile environment. You mean sufficient for the tort of outrage. Correct. Yes, sir. I cited about 6 cases in my brief, beginning on page 23, in which it describes cases in Alabama, very similar to these, but worse, in which the court in Alabama held that those were not tort of outrage claims. They did not rise to the level of severe enough evidence in terms of emotional stress or misconduct. So I want to move on to, I think that's a clear case. I really believe we're due to be affirmed on that. As far as Ms. Anderson goes, that's another one too. Her allegations morphed as time went by as well. The allegations that we're talking about in her appear in her brief on pages 17 and 32. And I think if the court reads all those allegations, the idea is threatened to put her under the water until the bubble stopped. I was afraid of physical harm. I asked him to stop. I was afraid of abuse. I was in an emotional state. I was teary-eyed. I was tormented. This is all quoted from page 32, 33. Suffering embarrassment, humiliation. Never was there any evidence offered of any medical treatment, any psychiatric treatment, counseling, no hospitalizations. Police were not called. She came to work every day. She worked six years and came to work. There was no loss of employment. Mr. Greaves, let me ask you this question. Your Honor, I have not seen a case that specifically stands for that proposition that you just said. However, all of the cases that I cited in my brief, starting on pages 9 and 10, they comment on the fact that there is no outward signifier. They talk about the fact that all of this alleged misconduct in these cases, the Turner v. Hayes, the Laurel v. Prince, the Crawford case, all of these talk about emotional stress, uncomfortable feelings, afraid, fear, crying, aggravation in so many words, annoyance, discontentment. And then they say, particularly in the State Farm case v. Morris, they say that an outward signifier or manifestation of the distress to satisfy the injury component of the outrage is important. And they talk about the fact that the plaintiffs did not seek professional treatment or counseling. That's in the State Farm case. So the signifier issue is what they talk about here. I believe that the closest case to our case, which is what Judge Kahlon relied on, he granted our directed verdict, as Mr. Carrere said. He realized that after listening to the testimony, and he didn't grant the motion until after the trial was over, and he said, I'm going to read, I'm going to go back and read the record. So Judge Kahlon went back and read the record and decided that the directed verdict should be that rises to the level of severe emotional distress. And he particularly relied upon the Turner v. Hayes case. And I believe that's instructive. I think that's similar to our case in which the plaintiff said that the supervisor had fondled his genitals in her presence, poked her and other females under the breasts, rubbed against her, touched her leg, questioned about a private life, made sexual innuendos in general, asked her to meet after work, tried to look up her skirt, kept her from doing her job, and took her password to a computer away and her time card away. In other words, supposedly this supervisor, Hayes, was doing everything he could to harass and to severely cause her to be in stress. And the court in Turner v. Hayes said that that was not enough to rise to the level of proving severe emotional distress. It does not meet the level of the cases, and McIsaac was cited in that case. That's an Alabama case where the court found over-the-top behavior on the part of a manager. And also in the Mardis case, which said even though there was a battery, there was no liability. So I think that, and we to Cavalier here, but we got to remember that when the Inman... I'm sorry? Counsel, it's a minute warning. Okay. I think when the Inman case came down the pike, and I guess I'm showing my age here, but I was practicing law when that case came out, and everybody said, what is this, you know? And this is going to be extreme situations, okay? This is not your regular recklessness or even intentional act of a tort. It's designed for a family burial context, wrongful misconduct. There's something about a dead body that the Supreme Court of Alabama said, if you start messing up in treatment of funeral homes and dead bodies, then it's going to be almost prima facie evidence of tort of outrage. It has to be barbaric methods by an insurance company, which is what the Inman case was. And then also egregious sexual harassment. So I'm just concerned that we're getting into an era, and I am very, very respectful of the MeToo movement, and it's calling our attentions to the importance of recognizing the treatment of women. I really do. But I think we want to make sure that we don't water down the tort law here, to where every time a case comes down the pike, it's an intentional infliction of emotional stress, because that is a very guarded, very narrow window of opportunity for proof. I want to talk real quickly about the assault and battery. What we're basically asking for here is that we think that the $250,000 that was awarded did not meet the punishment here, and we've briefed it, and we've said all we wanted to say in our brief, and we're just asking for a the amount of damages is excessive and demonstrates the prejudice on the part of the jury towards Dr. Johnson. That's all I have. Thank you very much. Thank you, sir. Mr. Greer, you've got your rebuttal. Yes. Again, this is Charles Greer for appellants. Just a few things that relate to the arguments from the Council for Surgical Care. This circuit's decision in Hicks v. Tuscaloosa, I believe, establishes pretty much what the circuit's standard for constructive discharge is. In Hicks v. Tuscaloosa, Ms. Hicks was a police officer who was seeking some accommodation to breastfeed, and the chief of police did not provide that. There, the circuit concluded that the city's refusal to provide the accommodation to Ms. Hicks is what compelled her to resign, and that met the constructive discharge standard. The important thing is that that standard has changed over time. Ms. Weiner talks about a Fifth Circuit case from the 1980s, and that may be true, but since that time, the Supreme Court, of course, decided Souter and decided Greer v. Brennan just in 2016, where they've now made it clear that in order to prove constructive discharge in a hostile environment situation, something more than the minimum necessary to prove hostile environment might be necessary, but that doesn't mean that the evidence of a hostile environment, if more than the minimum, is not sufficient to satisfy that standard. Then, more importantly, again, it must be we had attempted to consolidate SCA, the physician's organization, COPS, SCC, LLC, as one entity, and the defendants were very successful in establishing that SCA was not a joint employer, was not an integrated enterprise with these other entities. Whatever Dr. Johnson did with regard to taking his leave of absence, losing his position as medical director, that was not at the hands of SCA. SCA did not make that decision. They could not make that decision. In fact, they took no action at all. They left that to these other entities. And leading, going off of Judge Jordan, your comment about what is this duty that an of our complaint, they weren't told what the result was. All that Ms. Lackey is told is we're handling it. We're handling it. The next thing they know, there's a meeting where a new medical director is introduced, and the women reasonably concluded that that meant Dr. Johnson was good, not just as Dr. Johnson PC, the corporation, but that he was not coming back as anesthesiologist. When it turned out that wasn't true, it became, I think, evident to those women and to any reasonable person that SCA was not going to take anything that was going to protect them to remove him from the workplace. And SCA should not be permitted to take credit for whatever the other operations did or what Dr. Johnson did himself, which he described as a wonderful vacation or the most wonderful thing he'd been in years. With regard to the whole question of constructive discharge and Ms. Lackey and Ms. Anderson, we do discuss the problem of mitigating damages. And these two cases together raise the serious problem that Judge Jordan, I think you raised, is what is a reasonable person supposed to do? Knowing that this is now the third investigation with Dr. Johnson, and he's coming back to work, do you just stick it out and say, maybe the third time we'll stick? Well, Lackey says, I don't have to put up with that. No, I know better than that. As to Ms. Anderson, she could say, well, okay, I need my job. It's really important. I'm going to have to stick it up. It is a mitigation problem. With regard to Dr. Johnson's arguments, I just want to say that, one, of course, Judge England is a magistrate judge. He did not make any findings, rulings, or grant summary judgment. He made a report and recommendation. That report and recommendation was rejected. And Judge Kahlon rejected his evidentiary suggestions. And Dr. Johnson has not shown abuse of discretion. And we believe that he has not demonstrated that a remitter should be and tell the court exactly what we want. We would like the court to reverse the district court's decision of granting directed verdict with regard to Ms. Anderson's outrage claim. We would like to reverse the summary judgment. I'm sorry? No, go ahead. Yeah. We would like to reverse the granting of summary judgment on the constructive discharge claim for Ms. Anderson and on all of Ms. Lackey's claims. And then we would like the court to, with regard to the block building in the attorney's fee section, reinstate the hours removed from Ms. Haynes' hours as well as the hours removed from all the other attorneys for which there's no evidence of block building, block billing. And then with regard to the reduction of the load star to overturn the district court's decision, reducing the load star by 20% as being an abuse of discretion. Thank you. All right. Thank you very much. Thank you all. Thank you.